# United States Court of Appeals
## For the First Circuit

No. 19-1395

UNITED STATES OF AMERICA,

Appellee,

v.

JOSÉ ILARRAZA,
a/k/a KAE-KAE,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Howard, Chief Judge,
Selya and Kayatta, Circuit Judges.

Lenore Glaser, with whom Law Office of Lenore Glaser was on brief, for appellant.
Randall E. Kromm, Assistant United States Attorney, with whom Andrew E. Lelling, United States Attorney, was on brief, for appellee.

June 15, 2020

**SELYA**, **Circuit Judge**. It is apodictic that the guideline sentencing range (GSR) is the starting point for fashioning a sentence in a federal criminal case. See Gall v. United States, 552 U.S. 38, 49 (2007); United States v. Martin, 520 F.3d 87, 91 (1st Cir. 2008). But the GSR does not spring full-blown from the sentencing judge's brow. Rather, it is the product of a series of subsidiary determinations that the judge must make, many of which affect either the defendant's total offense level (TOL) or his criminal history category (CHC).

In this appeal, defendant-appellant José Ilarraza assigns error to a number of such subsidiary determinations. He says that these errors, singly and in combination, artificially boosted his GSR and, thus, improperly inflated his sentence. Concluding, as we do, that the appellant's asseverational array is all meringue and no pie, we affirm the challenged sentence.

## I. BACKGROUND

Because this sentencing appeal follows a guilty plea, we gather the relevant facts from the change-of-plea colloquy, the undisputed portions of the presentence investigation report (PSI Report), and the transcript of the disposition hearing. See United States v. Narváez-Soto, 773 F.3d 282, 284 (1st Cir. 2014). In the fall of 2017, federal authorities learned from a cooperating witness (CW-1), incarcerated in a Massachusetts prison, that the appellant (a fellow inmate) had offered to help him purchase

firearms to ship to the Dominican Republic. According to the information received, the appellant had told CW-1 to contact an individual named Bryan Torres-Almanzar (Torres), who was selling two firearms for $700 each and would be awaiting his call. The authorities enlisted a second cooperator (CW-2) to set up a controlled buy with Torres on CW-1's behalf.

In a series of recorded telephone conversations between September 10 and September 13, the appellant and Torres discussed their scheme to sell firearms to the two CWs. As relevant here, the appellant told Torres that he wanted to sell "the shittiest stuff" they had and that he had quoted CW-1 a price of around $700 or $800 per firearm. In the course of this conversation, the appellant made clear that the trafficked firearms were "going straight to the Dominican Republic." On another call, the appellant admonished Torres to "scratch everything off" the firearms that they were selling.

This planning came to fruition on September 13, when Torres and an associate, Eric Valentín, rendezvoused with CW-2 and sold him a semiautomatic handgun. Before the meeting, CW-2 deposited $700 into the appellant's canteen account as payment. The handgun had an obliterated serial number (as did each of the ten other firearms subsequently sold to CW-2).

That night, the appellant told Torres that CW-1 was concerned that CW-2 had only received one firearm instead of two.

The next day, Torres assured the appellant that he was about to sell CW-2 the second firearm. Within the hour, Torres and Valentín met CW-2 and sold him another semiautomatic handgun.

In the weeks that followed, CW-2 purchased firearms to CW-1's behoof from Torres and Valentín on four occasions. During this interval, the authorities recorded other telephone calls in which the appellant and Torres discussed some of the sales. On September 15 — with the appellant present — CW-1 called Torres and discussed the sale of three more firearms to CW-2. Four days later, Torres and Valentín sold CW-2 three semiautomatic pistols.

In a later discussion about the possible sale of two assault rifles, Torres expressed doubt that CW-2 could pay for them. The appellant reassured him that payment would not be a problem, explaining that the money was coming "from Santo Domingo." Notwithstanding this discussion, the next firearm that CW-2 bought (on September 28) was another pistol.

The appellant called Torres for the last time on October 2. In that conversation, Torres related that CW-2 wanted to purchase three more guns. Two days later, Torres and Valentín sold CW-2 three semiautomatic pistols. A final sale occurred on October 19, at which time CW-2 purchased another semiautomatic pistol and an assault rifle.

In due course, a federal grand jury sitting in the District of Massachusetts charged the appellant with conspiring to

deal in firearms without a license and dealing in firearms without a license (on a theory of aiding and abetting). See 18 U.S.C. §§ 371, 922(a)(1)(A); see also id. § 2. The indictment charged that the conspiracy continued until October 19, 2017 (the date of the final arms sale to CW-2). After initially maintaining his innocence, the appellant reversed his field and entered a straight guilty plea to both counts of the indictment.

The probation office prepared the PSI Report, which included a recommended calculation of the appellant's GSR. This calculation began by fixing the appellant's base offense level (BOL) at 12. See USSG §2K2.1(a)(7). From that plinth, the PSI Report then recommended a quartet of four-level enhancements because the offenses of conviction involved eleven firearms, see USSG §2K2.1(b)(1)(B), which had obliterated serial numbers, see USSG §2K2.1(b)(4)(B); the offenses involved trafficking in firearms, see USSG §2K2.1(b)(5); and the appellant had been complicit in transferring firearms with knowledge that they would be sent out of the country, see USSG §2K2.1(b)(6)(A). The PSI Report recommended a further two-level enhancement for the appellant's role as an organizer of the conspiracy, see USSG §3B1.1(c), and a three-level reduction for acceptance of responsibility, see USSG §3E1.1. These calculations yielded a TOL of 27.

Turning to the other side of the sentencing grid, the PSI Report chronicled a host of juvenile adjudications and one adult conviction, all accruing during the four years preceding the indictment. Pertinently, it assigned two criminal history points, see USSG §4A1.2(d)(2)(A), to certain of the juvenile adjudications based on the probation officer's review of records of the Massachusetts Department of Youth Services (DYS), which indicated that each such adjudication had resulted in the appellant spending at least sixty days in custody. In all, the PSI Report computed the appellant's criminal history score at 13 and placed him in CHC VI.

Both the government and the appellant objected to subsidiary guideline determinations in the PSI Report. The government submitted that the appellant's BOL should be increased by two levels because he was a "prohibited person" under USSG §2K2.1(a)(6)(A) due to his Massachusetts conviction on October 17, 2017, for resisting arrest (two days before the end of the charged conspiracy). For his part, the appellant raised a gallimaufry of objections both to the offense-level enhancements and to his criminal history score. In a revised PSI Report, the probation officer sustained the government's objection, raised the appellant's BOL to 14, and raised his TOL to 29. In all other respects, the probation officer reaffirmed the earlier recommendations.

With these amended calculations in hand, the revised PSI Report tentatively set the appellant's GSR at 151 to 188 months. This spread, though, was trumped by the combined statutory maximum for the counts of conviction — 120 months — which became the appellant's GSR.  See United States v. Breton, 740 F.3d 1, 22 (1st Cir. 2014).

Before the district court, the appellant renewed his earlier objections to the probation officer's subsidiary determinations.  The district court overruled all of these objections and adopted the revised PSI Report's calculations. After entertaining arguments of counsel and the appellant's allocution, the court imposed a downwardly variant 50-month term of immurement.  This timely appeal ensued.

## II. ANALYSIS

Appellate review of claims of sentencing error involves a two-step pavane.  See United States v. Flores-Machicote, 706 F.3d 16, 20 (1st Cir. 2013); Martin, 520 F.3d at 92.  We first examine any claims of procedural error.  See Flores-Machicote, 706 F.3d at 20; Martin, 520 F.3d at 92.  If the sentence clears these procedural hurdles, we then consider any claim that questions its substantive reasonableness.  See Flores-Machicote, 706 F.3d at 20; Martin, 520 F.3d at 92.  Because the appellant advances only assignments of procedural error, we do not address the substantive reasonableness of his downwardly variant sentence.

The starting point for sentencing is the calculation of the GSR.  See Gall, 552 U.S. at 49; Martin, 520 F.3d at 91. Typically, a material miscalculation of the GSR constitutes "a significant procedural error," which requires resentencing. United States v. Alphas, 785 F.3d 775, 779 (1st Cir. 2015).  This rule of thumb holds true even when — as in this case — the sentencing court has imposed a below-the-range sentence.  See id. at 779-80.

In this instance, the appellant tries to persuade us that the district court committed several errors that inflated the calculation of his GSR.  Inasmuch as he raised these claims of procedural error below, our review is for abuse of discretion. See United States v. Soto-Soto, 855 F.3d 445, 448 (1st Cir. 2017). We caution, however, that this standard of review is not monolithic:  under its aegis, we assay the district court's findings of fact for clear error and its interpretation and application of the sentencing guidelines de novo.  See Flores-Machicote, 706 F.3d at 20.  In applying the abuse-of-discretion standard here, we remain mindful that the government bears the burden of demonstrating the appropriateness of sentencing enhancements by a preponderance of the evidence.  See United States v. Cates, 897 F.3d 349, 354 (1st Cir. 2018).

We begin with the appellant's argument that the district court erred in finding that he was a "prohibited person" at the time of the offense. USSG §2K2.1(a)(6)(A). Since his argument centers on the meaning and application of the operative guideline provision, our review is de novo. See Flores-Machicote, 706 F.3d at 20.

The applicable guideline provision assigns a default BOL of 12 for most firearms offenses. See USSG §2K2.1(a)(7). But it ratchets up the BOL by two levels "if the defendant . . . was a prohibited person at the time the defendant committed the instant offense." USSG §2K2.1(a)(6)(A). The Sentencing Commission's commentary, in turn, identifies a "prohibited person" as "any person described in 18 U.S.C. § 922(g) or § 922(n)." Id. cmt. n.3. The former statute, among other things, refers to a person "who has been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year." 18 U.S.C. § 922(g)(1). Read together, these provisions trigger an enhanced BOL (14) for a defendant with a prior conviction for a crime punishable by more than one year in prison at the time he committed a firearms offense.

The appellant does not contest that his predicate conviction was for an offense that carries a maximum term of imprisonment of more than one year. See Mass. Gen. Laws ch. 268,

§ 32B(d). Because the conspiracy to traffic firearms was ongoing at the time of his predicate conviction — the appellant pleaded guilty to an indictment that described the conspiracy as lasting until October 19, 2017 — it appears as if his commission of the conspiracy offense transpired while he was a prohibited person. After all, the appellant's guilty plea constituted an admission that he was a member of the conspiracy until October 19 — two days after the occurrence of his predicate conviction. See United States v. Jones, 778 F.3d 375, 386 (1st Cir. 2015); United States v. Hernández, 541 F.3d 422, 425 n.1 (1st Cir. 2008); see also United States v. Grant, 114 F.3d 323, 329 (1st Cir. 1997) ("When a criminal defendant pleads guilty, he admits not only that he committed the factual predicate underlying his conviction, but also 'that he committed the crime charged against him.'" (quoting United States v. Broce, 488 U.S. 563, 570 (1989))).

In an effort to sap the strength of this reasoning, the appellant contends that he was not a prohibited person at the time of the instant offense because his predicate conviction postdated his active involvement in the charged conspiracy. This contention elevates hope over reason. It is settled that once an individual joins a conspiracy, his membership is presumed to continue through the end of the conspiracy unless and until he affirmatively shows that his membership was terminated at an earlier juncture either by his expulsion or by his withdrawal. See, e.g., United States

v. Mangual-Santiago, 562 F.3d 411, 422-23 (1st Cir. 2009); United States v. Piper, 298 F.3d 47, 53 (1st Cir. 2002). Given the continuing nature of a conspiracy offense, an individual "who has joined a conspiracy continues to violate the law" throughout the duration of his membership. Smith v. United States, 568 U.S. 106, 111 (2013). Seen in this light, we think it plain that section 2K2.1(a)(6)(A)'s reference to "the time the defendant committed the instant offense" means the entire period of a defendant's membership in a charged conspiracy, not merely the moments when he undertakes actions to further the goals of the enterprise.

We add, moreover, that the appellant's focus on the timing of his active involvement is at odds with the requirements for withdrawal from a conspiracy. A conspirator who seeks to withdraw from the enterprise must do more than merely cease active participation or shun his coconspirators. See United States v. Mehanna, 735 F.3d 32, 57 (1st Cir. 2013). Instead, he "'must act affirmatively either to defeat or disavow the purposes of the conspiracy,' such as by confessing to the authorities or informing his coconspirators that he has forsaken the conspiracy and its goals." Id. (quoting Piper, 298 F.3d at 53). Because a period of inactivity on the part of a conspirator, without more, does not constitute withdrawal from the conspiracy, it would defy logic to exclude that period from the duration of his conspiracy offense for the purpose of section 2K2.1(a)(6)(A).

To cinch the matter, guideline provisions should be construed in harmony with each other whenever the context permits. See, e.g., United States v. López, 957 F.3d 302, 308-09 (1st Cir. 2020); Hernández, 541 F.3d at 424-25. The appellant's contention offends this principle: it conflicts with our case law interpreting an analogous guideline provision. USSG §4A1.1(d) calls for the addition of two criminal history points "if the defendant committed the instant offense while under any criminal justice sentence." We have held that this provision applies to a defendant convicted of a conspiracy offense if he was serving a criminal justice sentence at any point during his membership in the conspiracy, regardless of whether that sentence overlapped with his participation in specific acts in furtherance of the conspiracy. See United States v. González-Colón, 582 F.3d 124, 128 n.4 (1st Cir. 2009); Hernández, 541 F.3d at 424-25. We see no reason to embrace a different understanding of when a defendant commits a conspiracy offense in applying section 2K2.1(a)(6)(A).

To sum up, we hold that the phrase "the time the defendant committed the instant offense" in section 2K2.1(a)(6)(A) refers, in the context of a conspiracy offense, to the entirety of a defendant's membership in the conspiracy. It follows that — absent either withdrawal or expulsion from the conspiracy — this provision demands a BOL of 14 for a defendant convicted of a firearms conspiracy offense if he became a prohibited person at

any point before the conspiracy terminated. Because the appellant became a prohibited person on October 17 — two days before the end of the conspiracy — the district court did not err in elevating his BOL by two levels under section 2K2.1(a)(6)(A).[1]

There is one loose end. The parties joust over whether the October 19 arms sale was reasonably foreseeable to the appellant and, thus, was relevant conduct under USSG §1B1.3(a)(1)(B). This squabble need not detain us. The two-level increase attaches here because the appellant was a member of the charged conspiracy until October 19, not because the October 19 sale comprised relevant conduct. Cf. Hernández, 541 F.3d at 425 & n.1 (holding that determination of period of conspiracy offense for purpose of section 4A1.1(d) did not require findings of specific acts attributable to conspirator who admitted period of conspiracy as part of guilty plea).

**B**.

The appellant goes on to challenge the district court's finding that the offenses of conviction involved eleven firearms.[2]

---

[1] The government contends that even if the district court erroneously increased the appellant's BOL by two levels, such an error was harmless because the resulting GSR would still exceed the combined statutory maximum for the counts of conviction. Because we find no error in the court's application of section 2K2.1(a)(6)(A), we need not inspect this contention.

[2] In this case, we need not determine whether the sale of all eleven firearms fell within the scope of the appellant's relevant conduct. The same four-level enhancement would apply as long as

See USSG §2K2.1(b)(1)(B). While he concedes that he helped coordinate the sale of the first two firearms, he challenges the finding that he was implicated in the subsequent sales (especially those that occurred after his final conversation with Torres). Because the challenged finding is a factual finding, our review is for clear error. See United States v. Goodson, 920 F.3d 1209, 1211 (8th Cir. 2019).

We set the stage. When determining the number of firearms involved in an offense, we consider all relevant conduct attributable to the defendant. See United States v. Damon, 595 F.3d 395, 401 (1st Cir. 2010). For jointly undertaken criminal activity, such as a conspiracy, a defendant's relevant conduct includes all reasonably foreseeable acts and omissions of coventurers within the scope of the conspiracy and undertaken in furtherance of it. See USSG §1B1.3(a)(1)(B). Here, the enhancement was warranted if the appellant's relevant conduct encompassed the unlawful sale of at least eight firearms. See supra note 2.

As said, the appellant does not challenge the district court's finding that he was responsible for the sale of the first two firearms. In addition, the record amply supports a finding that the September 19 sale of three firearms by his confederates

the offenses of conviction involved at least eight firearms. See USSG §2K2.1(b)(1)(B).

was reasonably foreseeable to him. After all, the appellant was present when CW-1 discussed this sale with Torres, and he knew at that time that CW-2 already had acquired some firearms.

Nor was this the last link in the foreseeability chain. The record makes manifest that Torres told the appellant on October 2 that CW-2 wished to purchase three additional firearms. The sale itself transpired two days later. Adding these three firearms to those previously enumerated, we conclude that the district court did not clearly err in finding that the offenses of conviction involved at least eight firearms.

## <u>C</u>.

We pivot now to the district court's application of the exportation enhancement. <u>See</u> USSG §2K2.1(b)(6)(A). The guidelines prescribe a four-level enhancement where the defendant "possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be transported out of the United States." <u>Id.</u>

The appellant admits that CW-1 stated that he wanted to buy firearms to send to the Dominican Republic. He protests, though, that there was no evidence that he either believed or should have believed this statement. The district court rejected this plaint and determined that the appellant's case fit within the contours of the exportation enhancement. Because this determination draws its essence from a factual finding concerning

the appellant's state of mind, our review is for clear error. See United States v. Torres-Velazquez, 480 F.3d 100, 103 (1st Cir. 2007) (reviewing for clear error finding that defendant knew laundered funds were related to drug trade).

Closely read, the record belies the appellant's protestations. When discussing the first sale, the appellant told Torres that CW-1 wanted to purchase firearms to send to the Dominican Republic. Moreover, during a later call on September 23, the appellant told Torres that he should not worry about payment for assault rifles because CW-1 was getting money from Santo Domingo (the capital of the Dominican Republic). Words may inform deeds, and the appellant offers no explanation as to why he would falsely relate to a confederate that CW-1 was shipping firearms to, and receiving money from, the Dominican Republic. Statements between coconspirators, made during and in furtherance of the conspiracy, are often deemed sufficiently reliable to warrant consideration by the factfinder, see Mehanna, 735 F.3d at 44 (describing defendant's statements to coconspirators during course of conspiracy as "highly probative" of his intent), and the sentencing court reasonably could have inferred from the appellant's statements to Torres that he believed the firearms were destined for foreign shores.

The appellant has a fallback position. He suggests that the exportation enhancement is inapplicable in this case for two

additional reasons:  because the trafficked firearms did not end up in the Dominican Republic and because his role in the conspiracy was too far removed from the planned exportation of the weapons. We think not.

We need not tarry.  Nothing in the language of the relevant guideline provision, USSG §2K2.1(b)(6)(A), mandates that, as a condition precedent to the enhancement, the trafficked firearms actually must cross an international border.  Nor does the guideline require, as a condition precedent to the enhancement, that a defendant must have played a direct, hands-on role in exporting trafficked firearms.  In short, neither of the appellant's proffered reasons for setting aside the sentencing court's state-of-mind finding throws shade on that finding.

## D.

Battling on, the appellant contests the four-level enhancement for engaging in firearms trafficking.  See USSG §2K2.1(b)(5).  He posits that the trafficking enhancement applies only to a defendant with actual knowledge that the recipient of the transferred firearms may not lawfully possess them.  Building on this porous foundation, he claims that CW-2 was virtually a stranger and, therefore, he (the appellant) lacked the requisite knowledge.

This claim is easily toppled.  The guideline commentary provides a two-part definition of trafficking.  See id. cmt.

n.13(A). For one thing, the defendant — as relevant here — must have "transported, transferred, or otherwise disposed of two or more firearms to another individual." Id. cmt. n.13(A)(i). For another thing, the defendant must have "kn[own] or had reason to believe that such conduct would result in the transport, transfer, or disposal of a firearm" either to a person "whose possession or receipt of the firearm would be unlawful" or to a person "who intended to use or dispose of the firearm unlawfully." Id. cmt. n.13(A)(ii).

The appellant does not dispute that his conduct satisfied the first of these elements. Consequently, the lens of our inquiry focuses on the second element. To satisfy that element, the government was required to show that the appellant knew (or had reason to believe) that CW-2 could not lawfully possess the firearms or that he intended to use or dispose of them unlawfully.

In addressing this guideline provision, the appellant mounts a thaumaturgical exercise in sleight of hand. Before us, he emphasizes that he did not know that CW-2 was prohibited from possessing firearms. But this is the reddest of red herrings: the second element of the trafficking definition contains two disjunctive prongs, and it is the unlawful use or disposition prong under which the government urged the enhancement.

- 18 -

It is true that the sentencing court did not make a specific finding when it overruled the appellant's objection to this enhancement. But when the basis for a sentencing court's finding is sufficiently clear from context, the absence of an explicit explanation for the finding is of no consequence. See United States v. Carbajal-Váldez, 874 F.3d 778, 783 (1st Cir. 2017) (explaining that reviewing court may uphold enhancement despite absence of explicit subsidiary findings when "the sentencing record, taken as a whole, reliably shows that the relevant factual questions were 'implicitly resolved' by the sentencing court" (quoting United States v. Van, 87 F.3d 1, 3 (1st Cir. 1996) (per curiam))). That is the case here: we think it pellucid that the sentencing court adopted the government's view that the appellant had abundant reason to believe that CW-2 intended to dispose of the firearms unlawfully. We review this factual finding for clear error, see United States v. Juarez, 626 F.3d 246, 251-52 (5th Cir. 2010), and we discern none. We explain briefly.

To satisfy the unlawful use or disposition prong, the government does not need to prove that the defendant knew "of any specific felonious plans on the part" of the recipient of the firearms. See United States v. Marceau, 554 F.3d 24, 32 (1st Cir. 2009). Nor must the government prove the defendant's knowledge of the recipient's intent by direct evidence. See id. Put simply, a sentencing court may rely on circumstantial evidence and the

plausible inferences therefrom to find that a defendant knew or had reason to believe that the recipient planned to use or dispose of the firearms in an unlawful manner.  See United States v. Taylor, 845 F.3d 458, 460-61 (1st Cir. 2017); Marceau, 554 F.3d at 32.

Let us be perfectly clear.  The bare fact that a person seeks to purchase firearms unlawfully is insufficient, in and of itself, to put the seller on notice that the buyer has plans to use or dispose of the firearms in connection with criminal activity.  See United States v. Moody, 915 F.3d 425, 430 (7th Cir. 2019).  Here, however, the evidence of the appellant's knowledge of the CWs' criminal plans extended well beyond the unlawfulness of the purchase.  As we already have explained, the district court supportably found that the appellant believed that the CWs intended to send the firearms to the Dominican Republic — and the appellant had no basis for thinking that either CW had a license to export firearms.  Cf. Taylor, 845 F.3d at 461 (finding no plain error in application of trafficking enhancement when defendant transferred sawed-off shotgun to individual who planned to resell it and "there was no indication that [the individual] would be the unusual firearms dealer who could legally own, much less legally resell, a sawed-off shotgun").

To make the cheese more binding, the appellant was aware that the CWs had expressed interest in purchasing a slew of

- 20 -

handguns and at least two assault rifles over the course of only a few weeks. The number and type of firearms that the CWs sought to buy over a short period of time provided further reason for the district court to doubt the appellant's claim that he did not believe that the purchasers intended to use or dispose of the firearms in connection with some nefarious activity. See id.; Juarez, 626 F.3d at 252.

Last — but surely not least — the district court reasonably could have concluded that the appellant took pains to remind Torres to scratch the serial numbers off the firearms before transferring them to CW-2. This reminder provides powerful (albeit circumstantial) evidence that the appellant believed that the CWs had felonious plans for the firearms because the obliteration of a serial number is almost always "done in anticipation that the gun will be used in criminal activity." Marceau, 554 F.3d at 32 (quoting United States v. Ortiz, 64 F.3d 18, 22 (1st Cir. 1995)). Especially given so telling a harbinger, the district court was entitled to disregard the appellant's self-serving claim of ignorance.

That ends this aspect of the matter. The appellant was aware that the CWs wanted to purchase a significant number of firearms, including assault rifles, with the stated intent of exporting them to the Dominican Republic. Prior to the first of the transactions, he instructed his coconspirator to remove the

serial numbers from the trafficked firearms. No more was needed to inoculate the district court's finding that the appellant knew or had reason to believe that CW-2 intended to dispose of the firearms unlawfully against clear error review.

**E.**

Next, the appellant takes aim at the district court's application of a two-level role-in-the-offense enhancement. By its terms, the relevant guideline provision applies when "the defendant was an organizer, leader, manager, or supervisor in any criminal activity" involving up to four participants.[3] USSG §3B1.1(c); see United States v. Al-Rikabi, 606 F.3d 11, 14 (1st Cir. 2010). The appellant argues that he was not an organizer but, rather, acted only as a "matchmaker" and a "cheerleader."

We begin with the basics. Section 3B1.1(c)'s two-level enhancement is warranted if the government satisfies two elements. See Al-Rikabi, 606 F.3d at 14. First, the record must show that "the criminal activity involved at least two, but fewer than five, complicit individuals (the defendant included)." Id. Second, the record must show that, "in committing the offense, the defendant exercised control over, managed, organized, or superintended the activities of at least one other participant." Id. We review a

---

[3] A more onerous enhancement may apply to a defendant who is shown to be an organizer, leader, manager, or supervisor of a criminal activity that comprised five or more participants or was otherwise extensive. See USSG §3B1.1(a)-(b).

- 22 -

district court's fact-bound determination of a defendant's role in the offense for clear error. See United States v. Alicea, 205 F.3d 480, 485 (1st Cir. 2000).

In the case at hand, it is clear that the criminal activity (the arms trafficking enterprise) involved three complicit participants: the appellant, Torres, and Valentín.[4] The issue, then, is whether the record supports the district court's determination that the appellant acted as an organizer. A defendant acts as an organizer "if he coordinates others so as to facilitate the commission of criminal activity." United States v. Bedini, 861 F.3d 10, 21 (1st Cir. 2017) (quoting United States v. Tejada-Beltran, 50 F.3d 105, 112 (1st Cir. 1995)). We have recognized several indicia that the defendant plays an organizational role, including substantial participation in the planning of the offense, the recruitment of accomplices, and the exercise of decisionmaking authority. See, e.g., id.; United States v. Arbour, 559 F.3d 50, 55 (1st Cir. 2009); see also USSG §3B1.1, cmt. n.4.

What is more, a defendant need not exercise complete hegemony over the entire criminal enterprise in order to qualify

---

[4] There is some suggestion in the revised PSI Report that the enterprise also may have included "soldiers" who worked for Torres and Valentín. But this point is largely undeveloped, and neither party has argued that we should regard the criminal activity as having more than three participants.

as an organizer.  See United States v. Ventura, 353 F.3d 84, 90 (1st Cir. 2003); cf. USSG §3B1.1, cmt. n.4 ("There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.").  Indeed, a defendant's direction of the activities of one other participant in connection with one criminal transaction is enough to bestow "organizer" status upon him.  See United States v. García-Morales, 382 F.3d 12, 19-20 (1st Cir. 2004); United States v. Cruz, 120 F.3d 1, 4 (1st Cir. 1997) (en banc).

Against this backdrop, the district court (adopting a recommendation contained in the revised PSI Report) found the appellant to be an organizer within the purview of the guideline. Where, as here, the sentencing court has not made particularized findings as to the identity of the persons organized, the court of appeals may mine the record in order to identify those persons. See United States v. Zayas, 568 F.3d 43, 47 (1st Cir. 2009) (per curiam); United States v. Ramos-Paulino, 488 F.3d 459, 463 (1st Cir. 2007).  In this case, that excavation reveals ample evidence to support a conclusion that the appellant organized the activities of Torres with respect to the initial arms sales to CW-2.[5]

---

[5]  To recapitulate, the appellant identified CW-1 as a prospective buyer and offered up Torres as a willing seller.  He then helped arrange the sale of the first two firearms through telephone conversations with Torres, during which conversations he discussed what firearms to sell and how much to charge. Importantly, the appellant gave Torres what reasonably could be

To be sure, the appellant identifies some facts that could be construed to indicate that Torres was running the show. For example, Torres procured the firearms that were trafficked; only he — not the appellant — had contact with Valentín and CW-2; and he and/or Valentín apparently retained the proceeds from all but the first arms sale. These facts, however, may instead reflect the appellant's incarceration during the period when the criminal enterprise was in motion. At bottom, then, a reasonable factfinder could have viewed the appellant's role in one of two different ways — either as an organizer of Torres's activities or simply as a facilitator. This duality lights our path: "where there is more than one plausible view of the circumstances, the sentencing court's choice among supportable alternatives cannot be clearly erroneous." United States v. Dunston, 851 F.3d 91, 101-02 (1st Cir. 2017) (quoting United States v. Ruiz, 905 F.2d 499, 508 (1st Cir. 1990)). So it is here.

To say more would be to trespass on the reader's indulgence. Since the record plainly shows that there were at least two culpable participants in the criminal activity (the appellant and Torres) and since the district court had a reasonable basis for inferring that the former organized the activities of

---

construed as directions concerning salient details of the sale. Nothing makes this fact more evident than the appellant's admission, when entering his guilty plea, that he told Torres "how much money to charge" for the firearms.

the latter, we detect no clear error in the district court's application of the two-level enhancement. The district court plausibly could view the sale of the first two firearms as the consummation of the appellant's idea to sell firearms to CW-1 and his recruitment and coordination of Torres in order to execute his plan.

**F.**

This brings us to the appellant's final sortie: his attack on the district court's computation of his criminal history score. To begin, the sentencing guidelines assign two criminal history points to a "juvenile sentence to confinement of at least sixty days if the defendant was released from such confinement within five years of his commencement of the instant offense." USSG §4A1.2(d)(2)(A). Any other "juvenile sentence imposed within five years of the defendant's commencement of the instant offense" receives one criminal history point. USSG §4A1.2(d)(2)(B).

In the case at hand, the PSI Report initially recommended that certain of the appellant's juvenile adjudications receive two criminal history points because his DYS records showed that each of them resulted in at least sixty custodial days.[6] The appellant objected to this recommendation, but the probation officer

---

[6] The probation officer concluded that, in each instance, the appellant was released from custody within five years of the commencement of the charged conspiracy. The appellant has not challenged this conclusion.

- 26 -

rejected the appellant's importunings and reaffirmed the recommendation in a revised PSI Report. Before the district court, the appellant again objected. The district court overruled this renewed objection and followed the revised PSI Report's lead.

The appellant argues that each of the disputed adjudications should have carried only one criminal history point. He says that his DYS records "are not clear as to the amount of time in juvenile custody" and that "[t]here is no . . . proof of which case or cases received sentence [sic] of more than sixty days." He also says that "[h]e was placed in the legal custody of [DYS], which does not necessarily mean physical custody or detention."

This line of argument is fatally underdeveloped. As a threshold matter, it is unclear whether the appellant means to assert that his DYS records fail to show a separate sentence of at least sixty days of confinement for each juvenile adjudication, means to assert that he was sentenced to a form of DYS custody that does not qualify as "confinement" under section 4A1.2(d)(2)(A), or means to advance a grab-bag theory based on some combination of these two arguments. And although his attack seems to involve a disagreement with the probation officer's reading of his DYS history, the documents underlying that history are not part of the record on appeal (and for that matter, do not seem to have been made part of the record below). Consequently,

there is no meaningful way in which we can assess the appellant's assertion that the probation officer misinterpreted the time he spent in custody.

The problem goes from bad to worse. The appellant's attack takes aim at the scoring of four separate juvenile adjudications, but he fails even to mention — let alone provide any details about — any particular adjudication. And to the extent that the appellant is endeavoring to argue that any or all of his juvenile sentences resulted in a form of DYS custody that should not qualify as "confinement," he does not point to even a scintilla of supporting evidence. Nor does he identify any authority defining these terms. On this meager record, we are simply unable to determine what force, if any, the appellant's attack might have.

We have emphasized before — and today reiterate — that parties must bear responsibility for developing their arguments on appeal. See, e.g., United States v. Pinkham, 896 F.3d 133, 141 (1st Cir. 2018); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). To carry this modest burden, a party must do more than merely "mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." Zannino, 895 F.2d at 17. In this instance, the appellant has shirked this responsibility: he has failed either to articulate his theory about the scoring of his juvenile adjudications with so much as a

rudimentary degree of clarity or to amplify the factual and legal basis for any other arguments on this issue that he purposes to make. In light of these deficiencies, his claim that the district court erred in calculating his criminal history score amounts to little more than the frenzied brandishing of a cardboard sword. We therefore treat this claim as waived. See id. ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

## III. CONCLUSION

We need go no further. For the reasons elucidated above, the challenged sentence is

**Affirmed.**