# United States Court of Appeals
## For the First Circuit

No. 21-1487

UNITED STATES OF AMERICA,

Appellee,

v.

TERRICK BISHOFF,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Timothy S. Hillman, U.S. District Judge]

Before

Kayatta, Thompson, and Gelpí,
Circuit Judges.

Christine DeMaso for appellant.
Karen L. Eisenstadt, Assistant United States Attorney, with
whom Rachel S. Rollins, United States Attorney, was on brief, for
appellee.

January 19, 2023

**GELPÍ, Circuit Judge.** Appellant Terrick Bishoff ("Bishoff") entered a straight plea to possessing or transferring a machinegun, dealing in firearms without a license, and possessing a firearm without a serial number. The district court, by way of downward variance, sentenced him to sixty months imprisonment. On appeal, Bishoff claims that the district court erred in imposing two four-level enhancements -- one for trafficking and one for possessing a firearm in connection with another felony -- and that his sentence is procedurally and substantively unreasonable. We affirm.

## I. Background[1]

### Relevant Facts

In February 2019, a Confidential Source ("CS") informed the government that Bishoff was selling Glock-style "ghost" guns[2] in Fitchburg, Massachusetts. Consequently, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") utilized the CS and an Undercover Officer ("UC") to conduct undercover purchases as part of an ongoing investigation into Bishoff. The UC purchased

---

[1] We take the facts from the uncontested portions of the Presentence Report ("PSR") and the sentencing hearing transcript. United States v. Bermúdez-Meléndez, 827 F.3d 160, 162 (1st Cir. 2016).

[2] Ghost guns are firearms sold as sets of parts that can be assembled at home, and that typically lack markings such as serial numbers.

firearms and ammunitions from Bishoff on three separate occasions, which are detailed seriatim.

### The May 10, 2019 Controlled Purchase

On May 10, 2019, the CS called Bishoff and informed him that his friend, the UC, wanted to buy the Glock-style ghost gun that Bishoff had previously offered to sell to the CS. The UC posed as a military veteran. Bishoff told the UC that he had to go get the firearm and would meet both the CS and UC shortly thereafter. Around 4:00 p.m. that same day, Bishoff, during a call with the CS, said that he was heading over to his supplier's house to get the firearm and that it was custom tailored to include a silencer.[3] About fifteen minutes later, Bishoff called the CS to inform him that he had the gun and would meet him shortly. Once at the meeting point, the CS and the UC entered Bishoff's car, where Bishoff sold the UC the Glock-style ghost gun for $580. Additionally, Bishoff provided the UC with one magazine and two boxes of ammunition. Bishoff told the UC that the firearm had no serial number and, thus, was untraceable. He also offered a fully automatic Uzi-style gun ("Uzi machinegun") with no serial number for $2,500.

---

[3] John Shaw, Bishoff's supplier, would later testify that Bishoff had provided drugs to Shaw (in addition to cash) in exchange for either guns or the assembly of guns. During one of the sales, Bishoff admitted to the UC that he was a drug dealer.

<u>The May 15, 2019 Controlled Purchase</u>

On May 13, 2019, the UC texted Bishoff regarding the Uzi machinegun.  The pertinent text exchange follows:

UC: "I wanted to talk to you about the U... is it still available?"

Bishoff: "Yes"

UC: "Is it full rock and roll? An [sic] what about numbers?"

Bishoff: "Yes...2500"

UC: "No numbers?"

Bishoff: "No"
"None"

UC: [thumbs up emoji]
"Are you locked in at 25? Any wiggle room"

Bishoff: "Yes.....and not my price"

On May 15, 2019, the UC and Bishoff exchanged text messages regarding the availability and sale of the Uzi machinegun. They met in Fitchburg, MA and drove in Bishoff's car to a nearby cemetery.  There, Bishoff exchanged with the UC the promised Uzi machinegun along with a twenty-five round magazine for $2,500. The Uzi machinegun contained an obliterated serial number.  They further spoke about other types of firearms that Bishoff's supplier could assemble, as well as a silencer for the pistol that the UC bought on May 10, 2019 (the first transaction between Bishoff and the UC).  Bishoff told the UC that he did not know how long it

would take to procure the silencer, but he would ask his supplier and get back to him.

<u>The July 24, 2019 Controlled Purchase</u>

On July 18, 2019, the UC and Bishoff met once again in Fitchburg, MA and Bishoff showed the UC a Glock-style ghost gun that was available for $800. Bishoff informed the UC that the gun had no serial number. On July 24, the UC completed a controlled purchase of said ghost gun and one magazine for $800. The UC asked why he had driven a different car to this meeting. Bishoff explained that he swapped cars every two weeks because he was also a fentanyl dealer. During the meeting, they also discussed possible future transactions, specifically the sale of an assault rifle and a silencer for the previously purchased Glock-style ghost gun. Bishoff stated that he was going to give money to his supplier so that he could order the parts for the assault rifle, and once it was assembled, Bishoff would contact the UC. Bishoff added that the assault rifle would be fully automatic and have no serial number.

**Procedural History**

Bishoff was arrested on September 24, 2019 after being charged in a three-count indictment with (1) possession or transfer of a machinegun in violation of 18 U.S.C. § 922(o); (2) dealing firearms without a license in violation of 18 U.S.C. § 922(a)(1)(A); and (3) possession of a firearm (Uzi machinegun)

without a serial number in violation of 26 U.S.C. § 5861(i). His supplier, John Shaw, was also indicted and arrested. In a post-arrest interview, Shaw admitted to assembling the firearms for Bishoff. Although both men pled guilty, only Shaw entered into a plea agreement with the government. Under his plea and cooperation agreement, Shaw received a base offense level of 20, with a two-level enhancement because the offense involved three to seven firearms, and a three-level reduction for acceptance of responsibility. Bishoff, on the other hand, decided to enter a straight plea. At his plea hearing, the district court explained that it could not calculate Bishoff's sentencing range until it had his PSR. The district court also asked the government for its position as to the Sentencing Guidelines. The prosecutor understood Bishoff's base offense level to be 18, that a two-level enhancement applied because the offense involved three to seven firearms, and that Bishoff qualified for a three-level reduction for acceptance of responsibility -- resulting in a total offense level of 17 and a Guidelines sentencing range of "roughly 24 to 30 months" imprisonment.

Bishoff's PSR ultimately upended the government's estimate by calculating a total offense level of 27 and a Guidelines sentencing range of 70 to 87 months. The PSR contained two additional four-level enhancements, one under Guidelines

section 2K2.1(b)(5)[4] for trafficking and another under Guidelines section 2K2.1(b)(6)(B)[5] for possessing a firearm "in connection with [a] felony offense." Bishoff objected to both four-level enhancements, arguing that the trafficking enhancement was inappropriate because he had no reason to know that the sale would result in further unlawful conduct, and that the other-felony-offense enhancement was improper because his supplier's statement, that Bishoff exchanged guns for drugs, was not credible.

At the sentencing hearing, the district court noted Bishoff's objections to the PSR. The government called Shaw and the UC to testify in support of the enhancements. The government argued that the section 2K2.1(b)(5) trafficking enhancement applied because Bishoff "had every reason to know that the person he was selling to would be using those guns unlawfully." It further argued that the section 2K2.1(b)(6)(B) other-felony-

---

[4] Section 2K2.1(b)(5) applies to defendants who "engaged in the trafficking of firearms." The guideline commentary provides a two-part definition of trafficking. See USSG § 2K2.1(b)(5) cmt. n.13(A). The commentary states, in relevant part, that the defendant must have "kn[own] or had reason to believe that such conduct would result in the transport, transfer, or disposal of a firearm" either to a person "whose possession or receipt of the firearm would be unlawful" or to a person "who intended to use or dispose of the firearm unlawfully." Id. cmt. n.13(A)(ii)(I)-(II).

[5] Section 2K2.1(b)(6)(B) applies to defendants who use or possess "any firearm or ammunition in connection with another felony offense; or possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense."

offense enhancement applied because Bishoff gave Shaw drugs in exchange for either the guns or the assembly of the guns. The district court found that the government had proven the elements of both enhancements but varied downward and sentenced Bishoff to 60 months imprisonment.[6] Bishoff objected to both four-level enhancements, as well as to the substantive and procedural reasonableness of his sentence.

## II. Standard of Review

This appeal contests specific components of Bishoff's sentence and challenges the overall reasonableness of the sentence. We review a preserved procedural Guidelines challenge for abuse of discretion. In applying this standard, we review factual findings for clear error, and the "interpretation and application of the [S]entencing [G]uidelines de novo." United States v. Ilarraza, 963 F.3d 1, 7-8 (1st Cir. 2020). Additionally, we remain mindful that the government must prove the enhancements' applicability by a preponderance of the evidence. Id. at 8.

In assessing a sentence's procedural and substantive reasonableness, "[o]ur review process is bifurcated: we first determine whether the sentence imposed is procedurally reasonable and then determine whether it is substantively reasonable." United

---

[6] Shaw's sentencing occurred months later. He was sentenced to 21 months in prison as per the parties' joint recommendation. Shaw also testified for the government at Bishoff's sentencing hearing.

States v. Flores-Quiñones, 985 F.3d 128, 133 (1st Cir. 2021) (quoting United States v. Reyes-Torres, 979 F.3d 1, 6-7 (1st Cir. 2020)).

**III. Discussion**

**Trafficking Enhancement**

We first address Bishoff's contention that the district court erred in applying the four-level trafficking enhancement, USSG § 2K2.1(b)(5). Bishoff challenges the district court's interpretation of the enhancement, arguing that he only sold one unserialized machinegun, while the enhancement requires that two or more guns be sold with knowledge or reason to believe that the UC would possess or use them unlawfully. To this second factor, he further argues that the district court erred because there is no evidence that he knew or had reason to believe that the UC intended to use any of the guns unlawfully. Rather, he claims that the UC presented himself as a military veteran who "acted like a firearm aficionado excited about unique, customizable guns."

We review the district court's presumed interpretation of the enhancement de novo. Ilarraza, 963 F.3d at 8. The Sentencing Guidelines' commentary provides a two-part definition of trafficking. See USSG § 2K2.1(b)(5) cmt. n.13(A). First, the defendant must have "transported, transferred, or otherwise disposed of two or more firearms to another individual," or

received two or more firearms with the intention to do so.  Id. cmt. n.13(A)(i).  Next, he must have "kn[own] or had reason to believe that such conduct would result in the transport, transfer, or disposal of a firearm" to a person "whose possession or receipt of the firearm would be unlawful" or "who intended to use or dispose of the firearm unlawfully." Id. cmt. n.13(A)(ii).  Plainly read, the enhancement applies if Bishoff transferred two or more guns while having reason to believe that at least one of them would be used or possessed unlawfully.  As the government does not seek affirmance based upon an unlawful possession theory, we focus on whether Bishoff knew or had reason to believe that the UC intended to use or dispose of at least one of the purchased firearms unlawfully.  We review the district court's factual findings on this question for clear error.  Ilarraza, 963 F.3d at 8.

Although the district court did not make an explicit finding as to the enhancement, there is no need for the same as its basis is "clear from context."  See id. at 12; see also United States v. Carbajal-Váldez, 874 F.3d 778, 783 (1st Cir. 2017) (noting court may "implicitly" adopt findings and resolve factual questions).  "[W]e think it pellucid that the [district] court adopted the government's view that [Bishoff] had . . . reason[s] to believe that [the UC] intended to [use or] dispose of the firearms unlawfully."  Ilarraza, 963 F.3d at 12 (reviewing the court's factual finding for clear error).

- 10 -

The circumstantial evidence presented at the sentencing hearing established by a preponderance of the evidence that Bishoff knew or had reason to believe that the UC intended to use or dispose of each of the firearms illegally. The government did not need to prove that Bishoff "had specific knowledge of any specific felonious plans" or present direct evidence to prove Bishoff's knowledge. See United States v. Marceau, 554 F.3d 24, 32 (1st Cir. 2009). Here, Bishoff and the UC discussed on at least five occasions the lack of serial numbers on the firearms. For example, during a text message exchange before the Uzi machinegun transaction, the UC asked Bishoff to confirm that the gun would have "no numbers," which Bishoff confirmed. Days later, the UC also questioned whether the offered assault rifle would have "numbers on it." Possessing a machinegun lacking a serial number, such as the Uzi relevant here, is prohibited under federal law. 26 U.S.C. § 5861(i). While the fact "that a person seeks to purchase firearms unlawfully is insufficient, in and of itself, to put the seller on notice that the buyer has plans to use or dispose of the firearms in connection with criminal activity," Ilarraza, 963 F.3d at 12, the "removal of a serial number is indicative of 'anticipation that the gun will be used in criminal activity,' and thus that [Bishoff] knew or should have known that [the UC] intended to use or dispose of the firearm unlawfully." United States v. Taylor, 845 F.3d 458, 460 (1st Cir. 2017) (quoting

- 11 -

Marceau, 554 F.3d at 32). Here, neither of the two Glock-style ghost guns had serial numbers and the Uzi machinegun had an obliterated serial number.

Further, Bishoff fails to persuade us that he had no reason to believe that the firearms would be used for an unlawful purpose. Although he maintains that the UC was purportedly a gun aficionado who wanted "unique," custom guns, none of the guns were in fact customized for him (and yet, sold significantly above market value). The first Glock-style ghost gun was offered to the CS before the UC decided to buy it, and he did not know the Uzi machinegun was a combination of old and new parts until he saw it. The second Glock-style ghost gun was not the one Bishoff had previously shown him, but a similar one. While not dispositive, these facts create a reasonable inference that the desire to purchase the custom, untraceable weapons instead stemmed from a desire to use them to unlawful ends. This is bolstered by other circumstantial evidence before the court, such as the fact that the sales were conducted in clandestine locations and that Bishoff and the UC had briefly discussed drugs in the course of the third sale. Combining all the facts surrounding each sale, we find that the district court, thus, did not abuse its discretion by finding that the government had met its burden, and applying the trafficking enhancement accordingly.

## Other-Felony-Offense Enhancement

Bishoff asserts that the district court erred by applying a four-level enhancement based on his possession of firearms "in connection with another felony" without any explanation. USSG § 2K2.1(b)(6)(B). The government argues that Shaw's testimony claiming he exchanged the guns for drugs from Bishoff is credible and supports the district court's application of said enhancement.

A four-level enhancement applies to a defendant who possesses "any firearm or ammunition in connection with another felony offense." USSG § 2K2.1(b)(6)(B). The Sentencing Commission has explained that the requirement is met "if the firearm . . . facilitated, or had the potential of facilitating, another felony offense." Id. cmt. n.14(A). At the sentencing hearing, the district court asked, "if I believe that they didn't trade guns for drugs then it wouldn't apply; and if they did, it would, right?" Thus, the court clearly considered evidence of such a trade when it applied the enhancement. Based on the record before us, including the district court's firsthand impression of the evidence, we conclude that the court did not abuse its discretion.

In imposing the enhancement, the district court rejected Bishoff's argument alleging inconsistencies in Shaw's testimony and concluded that the government had met its burden. Bishoff

implies that we must "distrust" Shaw's testimony because Shaw had significant reason to lie and shift blame to Bishoff in order to minimize his own role in the distribution of the guns. He also posits that Shaw was inconsistent about the facts surrounding their exchanges, including whether he was paid in cash or drugs for assembling the guns. We find both contentions unpersuasive. Shaw's statements establish that Bishoff gave him drugs in exchange for guns, for either the firearms themselves or just their assembly. For our purposes, it does not matter which. Likewise, while Bishoff did mention to the UC that the price for the Uzi machinegun was not fixed by him, this does not evidence that Shaw never got paid with drugs.[7] We similarly reject Bishoff's contention that the district court's sentence implied that "two addicts sharing drugs" constituted "another felony" for the purposes of this enhancement. Rather, we see no abuse of discretion in the district court implicitly finding Shaw's statements to be credible, and imposing the other-felony-offense enhancement accordingly.

### Sentence Reasonableness

This brings us to Bishoff's final claim, which challenges the district court's allegedly disparate treatment of

---

[7] Bishoff also posits that the fact that Shaw was able to buy a $200 3D printer suggests that he paid Shaw in cash. We are not convinced. Shaw could have certainly obtained income from other sources.

him at sentencing.  He argues that the disparity between his sixty-month sentence and Shaw's twenty-one-month sentence (which has already been served) makes his sentence procedurally and substantively unreasonable.

We undertake challenges to the reasonableness of a sentence by analyzing the procedural aspects of sentencing and the sentence's substance.  See Marceau, 554 F.3d at 33; Flores-Quiñones, 985 F.3d at 133.  First, we look for any procedural errors, "such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence -- including an explanation for any deviation from the Guidelines range."  Marceau, 554 F.3d at 33 (quoting United States v. Politano, 522 F.3d 69, 72 (1st Cir. 2008)).  Here, we already found, supra, that the sentencing court committed no procedural error in calculating the applicable guidelines, and thus review the substantive reasonableness of the sentence for abuse of discretion.  Id.

Sentencing courts must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  This provision is primarily aimed at national disparities, rather than those between codefendants.  United

States v. Candelario-Ramos, 45 F.4th 521, 526 (1st Cir. 2022). However, "we have 'recognize[d] that "legitimate concerns may arise" if a judge sentences "similarly situated coconspirators or codefendants" to "inexplicably disparate" terms.'" Id. (quoting United States v. Romero, 906 F.3d 196, 211 (1st Cir. 2018)). With that in mind, this court has still rejected disparity claims when a defendant "fail[s] to acknowledge material differences between [his] own circumstances and those of [his] more leniently punished [codefendant]." United States v. Reyes-Santiago, 804 F.3d 453, 467 (1st Cir. 2015). In sentence disparity claims, a defendant must compare apples to apples. United States v. Mateo-Espejo, 426 F.3d 508, 514 (1st Cir. 2005).

Bishoff claims that the district court's divergent approach to common issues resulted in disparate sentences despite Shaw and Bishoff being "similar in many ways." We disagree. First, as Bishoff himself acknowledges, he and Shaw were charged with different offenses. Bishoff was charged with possession or transfer of a machinegun, dealing firearms without a license, and possession of a machinegun without a serial number, while Shaw was charged with being a felon in possession of ammunition and possession of a machinegun without a serial number. Moreover, the court could not have explained the reasons for the disparity during Bishoff's sentencing hearing because Bishoff was sentenced five months before Shaw and, at that point, there was no disparity to

consider or justify.  See United States v. McDowell, 676 F.3d 730, 733 (8th Cir. 2012) ("[S]entencing judges . . . are not required to consider events that have not yet occurred.").  Further, Bishoff and Shaw were situated differently.  After being arrested, Shaw immediately started cooperating with law enforcement and negotiated a plea agreement.  In contrast, Bishoff entered a straight plea and did not cooperate.  "'[M]aterial differences' between [Bishoff] and [Shaw] such as 'dissimilar criminal involvement . . . or cooperation with the government' destroy a disparity claim."  Candelario-Ramos, 45 F.4th at 526 (quoting Romero, 906 F.3d at 211-12).  We have previously pointed out that "the permissible distinction between co-defendants who go to trial and those who plead guilty, [and] between those who cooperate and those who do not, . . . undermine an assertion of unjustified disparity."  United States v. Reyes-Santiago, 804 F.3d 453, 467 (1st Cir. 2015) (internal citations omitted).  Thus, without appropriate comparators, Bishoff's disparity claim fails.  See United States v. González-Barbosa, 920 F.3d 125, 131 (1st Cir. 2019).

## IV. Conclusion

For the foregoing reasons, Bishoff's sentence is **affirmed**.