# United States Court of Appeals
## For the First Circuit

No. 24-1520

UNITED STATES OF AMERICA,

Appellee,

v.

CHANG GOO YOON,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Indira Talwani, U.S. District Judge]

Before

Barron, Chief Judge,
Rikelman and Aframe, Circuit Judges.

Leigh Ann Webster, with whom Strickland Webster, LLC was on brief, for appellant.

Karen L. Eisenstadt, Assistant United States Attorney, with whom Leah B. Foley, United States Attorney, was on brief, for appellee.

February 20, 2026

**AFRAME**, **Circuit Judge**.  Over four years, Chang Goo Yoon submitted more than a million dollars in false health insurance claims, resulting in his conviction on two counts of health care fraud under 18 U.S.C. § 1347.  He now appeals certain evidentiary rulings and the application of two enhancements under the sentencing guidelines.  We affirm.

## I. Offense Conduct

Because Yoon's appeal challenges evidentiary rulings, we provide a balanced summary of the trial evidence.  United States v. Villa-Guillen, 102 F.4th 508, 512-13 (1st Cir. 2024).

Yoon worked as a licensed physical therapist who owned and operated several clinics in Massachusetts.  Between November 2014 and November 2018, Yoon submitted numerous claims to private health insurers, including Blue Cross Blue Shield ("Blue Cross") and Aetna, for services he never rendered.  Yoon often billed for services that he supposedly provided while either he or the patient he claimed to treat was out of town.  Yoon also created false treatment notes under another provider's name and used those notes to submit personal injury claims to his own car insurer, MAPFRE, for never-performed physical therapy sessions.

To effectuate his scheme, Yoon submitted claims that listed his office address as his patients' addresses so that reimbursement checks went directly to him.  Doing so avoided

situations in which patients might become suspicious after receiving paperwork for services never rendered.

Eventually, Yoon's false billing caught up with him. A jury convicted him on two counts of health care fraud. Count One addressed the fraud against Blue Cross and Aetna; Count Two addressed the fraud against MAPFRE.[1]

## II. Evidentiary Challenges

### A.

Before trial, Yoon moved to exclude several pieces of evidence, two of which are relevant here. First, he sought to exclude "evidence regarding any investigation or adverse action by any private insurance companies" against him. Yoon was especially concerned about a 2015 investigation by Blue Cross into his billing practices. Based on the findings of its investigation, Blue Cross required Yoon to provide proof that he rendered the services in question before receiving any subsequent reimbursements. Yoon opposed the admission of evidence related to that investigation, including letters that Blue Cross sent to him.

Second, Yoon sought to exclude evidence regarding a 2007 investigation by Colorado authorities into his billing practices. Yoon had been licensed as a physical therapist in Colorado prior

---

[1] Yoon's appeal does not concern Count Two, so we do not discuss it further.

- 3 -

to the conduct at issue in this case. But after an allegation of misconduct by the Colorado licensure board regarding his billing practices, Yoon entered an agreement to suspend his license there. At trial, Yoon sought to keep out any reference to that investigation and its outcome.

The parties addressed this disputed evidence during two pre-trial conferences. At the first conference, the district court permitted the government to introduce evidence of Yoon's knowledge about the insurance company investigations; however, it did not allow the government to introduce the results of those investigations. The court reserved ruling on the admissibility of the Colorado investigation until Yoon provided more information about his defense strategy.

At the second conference, Yoon explained that he planned to argue he lacked a knowing and willful mental state, which is required for conviction of health care fraud under § 1347, see United States v. Troisi, 849 F.3d 490, 494 & n.8 (1st Cir. 2017), and instead submitted the false bills negligently because he was overworked and disorganized. Given that defense, the district court allowed the government to submit evidence of the Colorado investigation but again limited the evidence to Yoon's awareness of the investigation.

Finally, the parties discussed how the government would introduce evidence of the investigations. Most of the discussion

concerned an August 2015 letter sent from a Blue Cross fraud investigator, Martin Flood, notifying Yoon of the Blue Cross investigation; a 2018 letter from Flood to Yoon's then-attorney, Jonathan Plaut, explaining that Yoon had been placed on "pre-payment review," meaning Yoon had to submit proof that he rendered services before receiving reimbursements; and Plaut's response to Flood's 2018 letter. The district court decided to admit these letters, but required substantial redactions, including to parts of the letters stating that Flood was from the "fraud and prevention" unit. Still, the parties agreed that Flood could testify to his responsibilities at Blue Cross.

The parties also discussed how the government would introduce the evidence about the Colorado investigation. Ultimately, the district court allowed the government to ask a witness two yes-or-no questions about whether Yoon had ever acknowledged that his billing practices had been investigated by Colorado authorities.

At trial, the government called several witnesses, including Donna Dziedzic-Bianco, an investigator at Aetna, and Flood (together, "the investigators"). They testified about the billing rules and procedures of their respective employers. For example, they detailed the types of information that providers would include in claims and explained that providers could not submit claims for services rendered to family members. The

investigators also testified that some of Yoon's claims contained atypical or even unique patterns, such as claims with identical patient and clinic addresses and claims requesting that payment be sent to the clinic address.

Through Flood's testimony, the government also introduced the letters about the Blue Cross investigation. Flood explained that following the 2015 letter announcing the investigation, Yoon brought boxes of documents to a Blue Cross office and sat for an interview. Before Flood discussed the 2018 letters between Blue Cross and Yoon's attorney, the district court instructed the jury to consider the letters only insofar as they pertained to Yoon's knowledge and intent; it expressly told the jury not to consider the letters for their truth.

The government also called several of Yoon's employees. One testified that Yoon told her that Colorado authorities had investigated him. She also detailed how Yoon tracked his patients' insurance plans, explaining that Yoon described some policies as "pretty good" when they covered more of a claim. Another employee also noted Yoon's attention to billing, explaining that Yoon discouraged her from spending too much time with patients who had low reimbursement rates, and that Yoon once mentioned "insurance, [and] how much [insurers] pay based on their [billing] code."

**B.**

On appeal, Yoon asserts two evidentiary challenges. He argues that the district court should have excluded (1) the evidence related to the Blue Cross and Colorado investigations, and (2) the investigators' testimony. We review preserved evidentiary challenges for abuse of discretion and unpreserved challenges for plain error. See Alaniz v. Bay Promo, LLC, 143 F.4th 18, 29 (1st Cir. 2025). The parties dispute the applicable standard. Because Yoon's arguments fail under the more defendant-friendly abuse-of-discretion standard, we assume that Yoon preserved his claims unless otherwise noted. See id.

**1.**

Yoon challenges the admission of the Colorado and Blue Cross investigations under Federal Rules of Evidence 401 and 403. Rule 401 governs relevancy and permits the introduction of evidence so long as it is (1) probative, i.e., "it has any tendency to make a fact more or less probable," and (2) that fact is consequential "in determining the action." Fed. R. Evid. 401. Rule 401 sets a "very low threshold" for admission. United States v. Rathbun, 98 F.4th 40, 51 (1st Cir. 2024) (quoting United States v. Cruz-Ramos, 987 F.3d 27, 42 (1st Cir. 2021)). For its part, Rule 403 allows courts to exclude relevant evidence whose "probative value is substantially outweighed" by a risk of several considerations,

including "unfair prejudice, confusing the issues," and "misleading the jury." Fed. R. Evid. 403.

The evidence about the Blue Cross and Colorado investigations clears Rule 401's low bar and, for Rule 403 purposes, is quite probative. To overcome Yoon's mens rea defense, the government had to prove Yoon's "specific intent" to engage in fraud. Troisi, 849 F.3d at 494 n.8. Evidence of Yoon's knowledge that his billing practices were under investigation furthered that purpose. This evidence made it more likely that Yoon specifically knew his payors viewed proper billing practices as important which, in turn, made it less likely that he submitted false bills merely because he was disorganized and overwhelmed -- that is, "without intent, or by accident or mistake." Cf. United States v. Cassell, 292 F.3d 788, 796 (D.C. Cir. 2002) (explaining that evidence of prior convictions for gun possession made it less probable that the defendant was unaware of the weapons discovered in his room); United States v. Landrau-López, 444 F.3d 19, 24 (1st Cir. 2006) ("[W]here Landrau's knowledge of the contents of the duffel bags was the critical factual issue in dispute, the testimony establishing his participation in prior drug smuggling activities

as highly probative."). In a trial about Yoon's mental state, this evidence was not just relevant; it was highly probative.[2]

On the other side of the Rule 403 balance, there was minimal risk that the investigation evidence would confuse or mislead the jury or create unfair prejudice. The district court limited how this evidence was admitted so that the jury learned only that Yoon knew about the investigations without learning their results. Concerning the Blue Cross investigation, the relevant letters were heavily redacted. And before admitting these letters, the court instructed the jury to consider them only "as evidence of . . . Yoon's knowledge and state of mind," and prohibited it from considering the letters for their truth. The evidence of the Colorado investigation was even more benign. Its introduction was

---

[2] Yoon contends that the district court admitted the evidence solely based on the government's argument that the evidence showed Yoon "was aware of the need to comply with the rules," and not to show Yoon's specific intent. He thus asserts that the government's change in argument on appeal is barred by judicial estoppel. But the government's argument on awareness and specific intent are intertwined: Yoon's awareness of the investigations suggests that his conduct was willful and knowing. Moreover, the parties and the court explicitly discussed how this evidence tended to show Yoon's "particularized knowledge" that he should not submit false medical bills.

curated so that the government asked two yes-or-no questions that merely revealed Yoon's knowledge of the investigation.[3]

Yoon views the Rule 403 balance differently. He contends that the investigation evidence carried little probative value because most people know not to submit improper bills without first being placed under investigation. He also argues that the two letters from Blue Cross lacked probative value. On his view, the 2015 letter was too tepid to meaningfully notify him that he was in trouble and the 2018 letter came too late to demonstrate his state of mind during the relevant period.

These arguments fail. The government was warranted in establishing more than the general notion that most people know not to submit false bills because it had to demonstrate that Yoon specifically acted "with knowledge" that his conduct was unlawful.

---

[3] Testimony regarding the Colorado investigation came in as follows:

> [Prosecutor]: And did Dr. Yoon tell you he previously practiced as a physical therapist in Colorado? Oh, and can I caution the witness that -- I'm only asking for a yes-or-no answer.
>
> [Witness]: Yes.
>
> [Prosecutor]: And, again, a yes-or-no answer: Did Dr. Yoon tell you that his billing in Colorado was previously investigated?
>
> [Witness]: Yes. He said there was --
>
> [Prosecutor]: That's -- we just need a -- move to strike the answer beyond "yes."

United States v. Iwuala, 789 F.3d 1, 12 (1st Cir. 2015). Evidence that Yoon knew his billing practices were under investigation undermined suggestions that Yoon negligently failed to follow proper billing practices. As for the Blue Cross letters, the one from 2015 should have worried Yoon as it precipitated an investigation requiring him to bring boxes of paperwork to Blue Cross and to sit for an interview. And the 2018 letter was probative of Yoon's mental state on the many occasions he submitted false bills after receiving that letter.

Yoon also argues that evidence of past investigations was unduly prejudicial, confusing, and misleading. He contends that allowing evidence of past investigations could suggest that he violated Blue Cross's and Colorado's unspecified billing rules, thereby creating "alternative standard[s] of guilt." United States v. Muñoz-Franco, 487 F.3d 25, 65 (1st Cir. 2007) (quoting United States v. Christo, 614 F.2d 486, 491 (5th Cir. 1980)). Relatedly, Yoon argues that this evidence was unfairly prejudicial because it suggested that he "continued" to submit false bills even though he never admitted to the allegations in those prior investigations. But the limits placed on the investigation evidence addressed these concerns. The district court ensured that the jury never learned about the investigations' findings, let alone the standards used to evaluate Yoon's conduct. There was thus no reason for the jury to confuse the standard of guilt

- 11 -

or to assume Yoon "continued" to engage in improper conduct, since the jury never learned the investigation outcomes.

Yoon also challenges the efficacy of the district court's limits on the evidence. He points out that the unredacted portions of Blue Cross's 2018 letter stated that Yoon had been placed on pre-payment review and that Yoon could respond to the investigation's findings, thereby suggesting that Yoon had been found responsible for billing improprieties. However, Yoon had the opportunity to request further redactions to the letters between Blue Cross and his attorney, and he opted to do so only for portions of the letter sent from his attorney. Yoon's failure to request the additional redactions in the letter from Blue Cross to his attorney "constitute[s] a waiver." United States v. Liriano, 761 F.3d 131, 137 (1st Cir. 2014).[4]

---

[4] Yoon has also waived several other arguments related to the adequacy of the district court's evidentiary limitations. He complains that Flood testified that he was a member of the "fraud investigation and prevention unit" and that he attended a meeting with Yoon and the head of Blue Cross's fraud unit. But when the government stated that it wanted Flood to be able to testify about "what he does, what his job is, and what his . . . role is," Yoon's attorney responded that he was "not going to object to that" and affirmed that this evidence "comes in." He thus "intentionally relinquished" his objection, thereby waiving it. See United States v. Orsini, 907 F.3d 115, 119-20 (1st Cir. 2018). As for the head-of-the-fraud-unit testimony, Yoon failed to object to this statement at trial, which means that we would review the admission of this evidence for plain error; however, Yoon has made no plain error argument and therefore has waived it. See United States v. Castillo, 158 F.4th 257, 273 (1st Cir. 2025). Similarly, Yoon has waived his complaint that the district court did not provide an

In any event, the district court addressed Yoon's concern by instructing the jury to consider the letter only for the fact that it showed Yoon knew about the investigation; the court specifically told the jury not to consider the letter for its truth. Courts generally expect that juries follow such instructions, and Yoon has provided no reason for us to conclude otherwise here. See Samia v. United States, 599 U.S. 635, 646 (2023).

Finally, Yoon argues that he was unable to adequately cross-examine Flood about what occurred in the Blue Cross investigation because the district court told him that doing so would open the door to the government's introduction of the investigation's outcome. The record says otherwise. The court explained that if Yoon's cross-examination of Flood began to implicate the outcome of the investigation, the proper remedy would be for the government to object and for the court to provide a limiting instruction.

"[I]t is only in the rarest and most compelling cases that 'we, from the vista of a cold appellate record, [will] reject a judge's on-the-scene Rule 403 ruling.'" United States v.

_____

overarching instruction telling the jury not to treat the Blue Cross investigation as evidence that he committed fraud or had a wrongful intent. He did not request such an instruction, nor has he argued that it was plain error for the district court not to have given one. See id.

- 13 -

Soler-Montalvo, 44 F.4th 1, 16 (1st Cir. 2022) (quoting United States v. Rodríguez-Soler, 773 F.3d 289, 294 (1st Cir. 2014)). Here, the district court carefully considered the import of the investigation evidence to the government's case. It then placed numerous limitations on the introduction of that evidence to ensure that the government could use it only to make a legitimate point about Yoon's intent without unduly prejudicing him. There was no abuse of discretion.

**2.**

Next, Yoon challenges the testimonies of Flood and Dziedzic-Bianco in multiple respects.

Yoon's lead argument is that the district court incorrectly allowed the investigators to offer lay opinion testimony under Rule 701 when instead they should have been qualified as experts under Rule 702. We disagree.

Testimony is admissible under Rule 701 when it is based on the witness's "own perception or experience." United States v. O'Donovan, 126 F.4th 17, 37 (1st Cir. 2025). Lay testimony can include information learned "on the job," United States v. Maher, 454 F.3d 13, 24 (1st Cir. 2006), so long as it is "deduced 'from a process of reasoning familiar in everyday life,'" United States v. Sepúlveda-Hernández, 752 F.3d 22, 34 (1st Cir. 2014) (quoting Fed. R. Evid. 701 advisory committee's note to 2000 amendment). However, when testimony is based on some expertise or specialized

- 14 -

knowledge -- for example, knowledge of "technical Medicare laws and regulations," United States v. Vega, 813 F.3d 386, 395 (1st Cir. 2016) -- the testifying witness must be "disclosed" and "qualified as an expert" under Rule 702, O'Donovan, 126 F.4th at 36-37; see Fed. R. Evid. 701(c), 702.

Flood's and Dziedzic-Bianco's testimony falls squarely within Rule 701's bounds. They each explained their respective companies' "practices" based on their experiences as employees, Muñoz-Franco, 487 F.3d at 35-36, and flagged certain conduct that was atypical or that they had never seen. They thus merely "observ[ed] patterns and dr[ew] logical conclusions" from them as permitted under Rule 701. Vega, 813 F.3d at 394-95.

Contrary to Yoon's suggestion, Flood's one answer about his prior law-enforcement experience as part of his introductory recitation of his resumé does not change our conclusion. Flood's substantive testimony concerned his work at Blue Cross, and Flood did not suggest that his views about Blue Cross's practices were affected by his prior law-enforcement work.

Yoon also identifies several portions of the investigators' testimony that he believes violated Rules 403, 404(b), and 701(b). In this regard, Yoon contends that the investigators should not have been allowed to testify about how his "other billing practices" violated insurance company policy because he was charged only with submitting claims for non-existent

services.  He asserts that allowing this testimony permitted the jury to convict him based on violations of insurance company policy rather than for the criminal fraud with which he was charged.

We assume for the sake of argument that evidence about how Yoon's other "billing practices" violated insurance company policy should have been excluded.  Nevertheless, we fail to see how this evidence harmed Yoon because it is unlikely that it "contribute[d] to the verdict."  See United States v. Wilkerson, 251 F.3d 273, 280 (1st Cir. 2001).  Yoon did not dispute that he submitted false information to insurance companies and so falsity was not an issue at trial.  Instead, he argued that he was "careless" and "negligent" because he was a "terrible business manager" but that he was "not [a] criminal."  But evidence that he submitted claims that violated insurance company policy is entirely consistent with this negligence defense.  And given that argument, it is "highly [im]probable" that testimony about Yoon's violation of other insurance company policies affected the outcome of trial, especially because Yoon did not dispute the most blatant violation of all —- submitting false claims for scores of non-existent visits.  See Vega, 813 F.3d at 395 (quoting United States v. Amador-Huggins, 799 F.3d 124, 129 (1st Cir. 2015)) (admitting improper evidence of falsity was harmless where defense strategy focused on knowledge).

- 16 -

## III. Sentencing Challenges

At sentencing, the district court calculated Yoon's sentencing guidelines total offense level at twenty, which, when combined with a criminal history category score of I, yielded a recommended sentence of thirty-three to forty-one months in prison. The district court sentenced Yoon to twenty-seven months' imprisonment.

On appeal, Yoon challenges two guideline enhancements -- one about the amount of loss under U.S.S.G. § 2B1.1, and the other about whether Yoon abused a special skill or position of trust when committing the fraud under U.S.S.G. § 3B1.3. Because Yoon preserved his challenges to these enhancements, we review the district court's factual findings for clear error, its interpretations and applications of the guidelines de novo, and its judgment calls for abuse of discretion. United States v. Iwuanyanwu, 69 F.4th 17, 21-22 (1st Cir. 2023).[5]

### A.

To calculate loss in a fraud case, sentencing courts use the higher of either actual or intended loss. U.S.S.G. § 2B1.1

---

[5] We note that a twenty-seven-month sentence would have been at the bottom of the guidelines range had the district court accepted one of the two arguments Yoon made with respect to the appealed guideline enhancements. Had the district court accepted both arguments, a twenty-seven-month sentence would still be within the guidelines range, though it would be at the high end.

cmt. n.3(A) (2023).[6] The parties agree that here, actual loss does not exceed intended loss and so intended loss controls. They dispute, however, the proper framework for calculating Yoon's intended loss under the guidelines.

In cases "rife with fraud," we have applied the framework described in United States v. Alphas to calculate intended loss. 785 F.3d 775, 784 (1st Cir. 2015). Under that approach, we permit sentencing courts to calculate loss by using the total amount billed as a "starting point." Id. This approach derives from the "long-standing presumption in the law that . . . the face amount of a bill is presumptive evidence of the amount that the person who submits it expects to obtain." Iwuala, 789 F.3d at 14. The defendant, then, may rebut this presumption by proffering evidence establishing that he intended to reap some lesser amount. See Alphas, 785 F.3d at 784 (stating that the face value of fraudulent insurance claims may be offset by legitimate claims); Iwuala, 789 F.3d at 14 (stating that the face value of fraudulent insurance claims may be reduced to the amount the defendant expected to receive). Finally, after receiving all the evidence, the sentencing court need only make a "reasonable estimate of the loss," U.S.S.G. § 2B1.1, cmt. n.3(C), keeping in mind that "the

---

[6] Generally, courts use the guidelines in effect at the time of sentencing. United States v. Sarmiento-Palacios, 885 F.3d 1, 4 (1st Cir. 2018). Thus, all references and citations to the guidelines are to the 2023 edition.

- 18 -

government bears the burden of proving the applicability of a sentencing enhancement by preponderant evidence," Alphas, 785 F.3d at 784.

We have applied the Alphas framework to a variety of fraud schemes, including produce insurance fraud, Alphas, 785 F.3d at 777-78, 784; government health insurance fraud, Iwuala, 789 F.3d at 14; United States v. Ahmed, 51 F.4th 12, 25 & n.7 (1st Cir. 2022); other government benefits fraud, United States v. Rivera-Ortiz, 14 F.4th 91, 103 (1st Cir. 2021); and wire fraud, United States v. Arif, 897 F.3d 1, 11 (1st Cir. 2018). The Alphas framework is also consistent with the practice in many circuits.[7]

Here, the district court applied Alphas to calculate loss. After making some adjustments, it determined that Yoon had submitted $1,299,856 in fraudulent billings from which he derived

---

[7] See United States v. Geevers, 226 F.3d 186, 192-93 (3d Cir. 2000) (bank fraud); United States v. Miller, 316 F.3d 495, 503-04 (4th Cir. 2003) (mail fraud); United States v. Isiwele, 635 F.3d 196, 203 (5th Cir. 2011) (health care fraud); United States v. Popov, 742 F.3d 911, 915-16 (9th Cir. 2014) (same); see also United States v. Singh, 390 F.3d 168, 193-94 (2d Cir. 2004) (remanding for the defendant to "show, if he can, that the total amount he expected to receive from the [health] insurers was indeed less than the amounts he actually billed"); United States v. Holthaus, 486 F.3d 451, 456-57 (8th Cir. 2007) (observing in bankruptcy fraud context that the "face value of [a] concealed inheritance" is prima facie evidence of intended loss where defendant has not shown "he intended to defraud" a lesser amount).

$429,068.[8]  The court then explained that it intended to rely on the amount Yoon billed as a proxy for the amount he intended to take.  In response, Yoon argued that he did not reasonably expect to receive the full amount billed but rather, was keenly aware that insurance companies reimbursed at less than the full amount billed.  Nevertheless, he did not offer an alternative amount that he intended to obtain.  The court considered Yoon's argument. However, after hearing the government's argument, the court concluded that Yoon's intended loss was the amount he billed because he was an out-of-network provider, and therefore his reimbursements were not limited by a contract.  Thus, the court determined that Yoon would take whatever he got, making the billed amount a fair proxy for intended loss.  Accordingly, the court set the intended loss amount at $1,299,856.

---

[8]     These numbers are disputed.  The district court started its deliberation with $1,299,856 for submitted bills and $429,068 in received payments before discounting claims for services rendered to Yoon's family members, bringing the totals down to $1,141,685 and $390,053, respectively.  Later in the sentencing hearing, however, the court reverted to using $1,299,856 as the amount submitted.  At no point did Yoon correct or object to the district court's use of that amount, and he does not challenge it on appeal.  We thus use the initial calculations here.  But, in the end, it makes no difference which set of numbers we use. Regardless of whether the intended loss was $1,141,685 or $1,299,856, Yoon would have received a 14-point sentencing enhancement, U.S.S.G. § 2B1.1(b)(1)(H); and regardless of whether the intended loss was $390,0533 or $429,068, Yoon would have received a 12-point enhancement, id. § 2B1.1(b)(1)(G).

Yoon does not dispute that he engaged in a scheme rife with fraud. Instead, he argues that two amendments to the sentencing guidelines counsel against applying the Alphas framework to cases involving fraudulent bills submitted to a private health insurance company. Alternatively, he argues that the district court misapplied the Alphas framework to the facts before it.

We start with Yoon's claim that the district court erred by applying the Alphas framework at all. Yoon first flags a 2011 amendment to the guidelines stating that "the aggregate dollar amount of fraudulent bills submitted to [a] government health care program shall constitute prima facie evidence of the amount of the intended loss." U.S.S.G. § 2B1.1 amend. 749; see id. § 2B1.1 cmt. n.3(F)(viii). Yoon contends that this Amendment implicitly denies sentencing courts the ability to use submitted claims as prima facie evidence of intended loss in the private health insurance context because the Amendment only mentions government health care programs.

But just because the Sentencing Commission established a loss-calculation methodology for fraud claims involving government health care programs does not mean that it intended to prohibit the use of the same approach for private health insurance fraud. The more logical inference is only that district courts retain discretion to use submitted bills as a proxy for intended

- 21 -

loss in private health insurance fraud cases, as they do in all other fraud contexts. See United States v. Bertram, 900 F.3d 743, 752-53 (6th Cir. 2018) (holding, after the 2011 Amendment, that it was permissible in a private health insurance fraud case for the court to conclude "that the intended loss amount was best represented by the amount billed" in the absence of contrary evidence).

Second, Yoon points to a 2015 amendment that changed the perspective from which courts evaluate intended loss. See U.S.S.G. § 2B1.1 amend. 792. When we decided Alphas and Iwuala, courts in our circuit judged loss from an objective vantage. Iwuala, 789 F.3d at 14. The 2015 Amendment clarified that the proper test for calculating intended loss must focus on the "pecuniary harm that the defendant purposely sought to inflict" and thus required courts to apply a subjective standard. United States v. Carrasquillo-Vilches, 33 F.4th 36, 42-43 (1st Cir. 2022) (quoting U.S.S.G. § 2B1.1 amend. 792). Yoon argues that the movement from an objective to a subjective standard abrogates the Alphas framework. We disagree.

The 2015 Amendment merely replaces the perspective from which courts evaluate a defendant's claim that they intended to cause a loss less than the amount billed. There is nothing about this Amendment that prohibits the use of Alphas as a framework so long as the court applies a subjective standard when applying it.

Indeed, the guidelines' move to a subjective standard for adjudicating intended loss is an even better fit with the Alphas framework, which we have described as a "variation of the hoary rule that the face value of a fraudulent instrument may be treated as evidence of the amount that the fraudster intended to swindle." Iwuala, 789 F.3d at 14 (emphasis added).

Moving next to the application of the Alphas framework, Yoon argues that, in calculating intended loss, the district court should have established the intended loss based on the amount he received as reimbursement because he tracked how much each patient's insurance would reimburse for a given treatment and thus knew the exact amount he would receive for any claim. But our review of the record does not show that Yoon put forth definitive evidence that he knew reimbursement rates with this level of precision. Instead, he points to a handful of witness statements, which at best referred to Yoon's discussion with an employee about "insurance, [and] how much [insurers] pay based on their [billing] code." Demonstrating clear error is a high bar and these generalized and one-off statements are inadequate to upset the district court's findings, which need only constitute a "reasonable estimate" of loss. U.S.S.G. § 2B1.1, cmt. n.3(C); see United States v. Flete-Garcia, 925 F.3d 17, 28, 30 (1st Cir. 2019) (deferring to district court's loss calculation because it has

"considerable discretion in determining what evidence should be regarded as reliable in making findings as to the amount of loss").

Yoon also takes issue with the district court's logic. He argues that there was insufficient evidence to allow the court to conclude that out-of-network providers, like Yoon, expected to receive the full amount he billed. At this phase of the Alphas framework, however, it is Yoon's burden to proffer some amount by which his intended loss calculation should be reduced. See Alphas, 785 F.3d at 784. He has not done so other than to say it should be the amount he received. Without more, the district court is left to guess at the amount by which intended loss should be reduced. We do not require district courts to engage in such guesswork and therefore cannot find that the court clearly erred by using the face value of Yoon's submitted claims. Cf. Arif, 897 F.3d at 11 (deferring to district court's finding that the defendant provided "insufficient evidence" to downwardly adjust the loss amount).

Finally, Yoon zeroes in on a portion of the sentencing hearing where the district court stated that Yoon would submit bills until he got the amount he wanted. This, Yoon asserts, suggests that the amount he sought was the amount he ultimately received. We think Yoon overreads the district court's comment. The court made clear that it believed Yoon did not know precisely how much he would receive from each bill and would take as much as

he could get.  It also made clear that it believed Yoon's scheme was unlikely to be stopped without intervention.  It is not clear error for the sentencing court to use the amount billed as a proxy for intended loss where the defendant has not presented concrete evidence supporting a lower amount.  See Iwuala, 789 F.3d at 14.

**B.**

The district court also applied a two-level enhancement for instances in which the defendant "abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense."  U.S.S.G. § 3B1.3.  Applying this enhancement was not clear error.

A position of trust is one "characterized by professional or managerial discretion"; one in which the person holding that position is subject to little supervision.  U.S.S.G. § 3B1.3 cmt. n.1.  For the enhancement to apply, the position of trust "must have contributed in some significant way to facilitating the commission or concealment of the offense."  Id. As for the "special skill" portion of the enhancement, the guidelines note that "doctors" are an archetype because of their "substantial education" and that "members of the general public" do not possess their specialized skills.  Id. at cmt. n.4.  Here too, the special skill itself must have "facilitate[d]

significantly the commission or concealment of a crime." Id. at cmt. background.

Yoon, like other health care professionals, exercised "significant discretion" to determine what types of treatments were "necessary and appropriate for [his] patients." United States v. Hoogenboom, 209 F.3d 665, 671 (7th Cir. 2000). And, as the investigators explained, insurance companies must rely on medical professionals' good faith in using this discretion when they submit claims because insurers are swamped with reimbursement requests and thus cannot review each claim individually. See United States v. Hodge, 259 F.3d 549, 557 (6th Cir. 2001) ("Insurance companies, unable to review exhaustively [the defendant's] claims for purported service, deferred, as they ultimately must, to his managerial and professional judgment when processing his reimbursement claims."). In this sense, Yoon's position as a health care professional submitting claims to insurance companies -- who usually accept the claims at face value -- permitted him to execute the fraud. We thus affirm the application of the sentencing enhancement under the facts presented on the ground that Yoon abused a position of trust.

In doing so, we join those circuits which have ruled that a health care professional can occupy a position of trust in relation to a health insurance company. See United States v. Ntshona, 156 F.3d 318, 321 (2d Cir. 1998) (per curiam); United

States v. Sherman, 160 F.3d 967, 969-70 (3d Cir. 1998); United States v. Adam, 70 F.3d 776, 782 (4th Cir. 1995); United States v. Valdez, 726 F.3d 684, 694-95 (5th Cir. 2013); Hodge, 259 F.3d at 557; Hoogenboom, 209 F.3d at 671; United States v. Rutgard, 116 F.3d 1270, 1293 (9th Cir. 1997); United States v. Bikundi, 926 F.3d 761, 798-99 (D.C. Cir. 2019). The only circuit to reach the opposite conclusion premised its holding on the principle that the person in a position of trust must be a fiduciary of the victim. See United States v. Garrison, 133 F.3d 831, 837-39 (11th Cir. 1998); United States v. Williams, 527 F.3d 1235, 1250 (11th Cir. 2008). But we have already rejected that view. See United States v. Sicher, 576 F.3d 64, 70 & n.5 (1st Cir. 2009).

Yoon makes three contrary arguments to no avail. First, he contends that the district court was unclear as to whether it applied the adjustment because he possessed a special skill or because he abused a position of trust. The court did address skill enhancement while discussing the application of the abuse of trust enhancement, but at sentencing, the court also noted that "the only people who can submit these claims [to insurance companies] are licensed physicians or physical therapists, et cetera" and further noted that "the case law supports the notion that this type of a relationship with the insurance company would justify applying [the § 3B1.3 enhancement]." That is, the court adopted the reasoning we have endorsed here: Yoon's position as a

- 27 -

healthcare professional submitting claims for reimbursement put him in a position of trust vis-a-vis the insurance companies.

Second, Yoon argues that, because he was an out-of-network provider, his relationship with the health insurance companies was much like a typical, arms-length contractual relationship. The record belies the distinction. Dziedzic-Bianco explained that Aetna took every claim at face value, and Flood explained that Blue Cross typically relied on practitioners' good faith in making reimbursements. Nothing about their testimony suggests that they treated Yoon more skeptically because he was out-of-network.

Finally, Yoon argues that though he possesses a special skill, that skill did not "significantly facilitate[]" the commission of his crime. United States v. Nelson-Rodriguez, 319 F.3d 12, 57 (1st Cir. 2003) (quoting U.S.S.G. § 3B1.3). But as we explained, Yoon's conduct constituted an abuse of trust, which supports applying the § 3B1.3 enhancement in these circumstances.

## IV. Conclusion

For the foregoing reasons, we **affirm** Yoon's conviction and sentence.